FIRST DIVISION

June 27, 2005

No. 1-03-1657

THE DOW CHEMICAL COMPANY, 
)    Appeal from the

) Circuit Court of

Plaintiff-Appellee and Cross-Appellant, ) Cook County.

)    

v. )        No. 01 L 50340

)

THE DEPARTMENT OF REVENUE, and )

GLEN L. BOWER, Director of the ) 

DEPARTMENT OF REVENUE, ) Honorable

)    Thomas R. Chiola,

Defendants-Appellants and Cross-Appellees. )    Judge Presiding.

JUSTICE GORDON delivered the opinion of the court:

The Dow Chemical Company (Dow) brought an action for administrative review, challenging the decision of the director of the Illinois Department of Revenue (the Department) that a Dow subsidiary, Marion Merrell Dow, Inc. (Marion Merrell Dow), was part of Dow's "unitary business group" for Illinois income tax purposes during the tax years 1990 through 1993.  The circuit court upheld the director's decision with respect to the year 1990, but reversed it with respect to the years 1991 through 1993.  
For the reasons that follow, we affirm
 the judgment of the circuit court.

BACKGROUND

I.  
Stipulated Facts

In the course of the administrative proceedings, the parties submitted joint stipulations of fact, which are part of the record on appeal.  The parties stipulated to more than 100 facts and nearly 300 exhibits, summarized as follows.

Illinois Income Tax Deficiencies

Dow is a Delaware corporation with its principal place of business in Midland, Michigan.  Dow has three distinct types of businesses: (1) chemical and performance products, (2) plastics and (3) hydrocarbons and energy.  During the tax years at issue, a group of Dow subsidiaries elected to file consolidated federal income tax returns.  However, Dow subsidiary Marion Merrell Dow, which is a Delaware corporation headquartered in Kansas City, Missouri, did not file consolidated federal income tax returns with Dow. 

Dow timely filed its Illinois income tax returns for the years at issue, while Marion Merrell Dow did not file Illinois tax returns.  On the returns, Dow did not include in its "unitary business group"
(footnote: 1) Marion Merrell Dow and Marion Merrell Dow's wholly owned subsidiary, Merrell Dow Pharmaceuticals, Inc. (Merrell Dow Pharmaceuticals).  In 1992, after auditing the returns, the Department issued a notice of deficiency to Dow.  The notice of deficiency asserted, in pertinent part, that for the year 1990 Dow's "unitary business group" should have included Marion Merrell Dow and its subsidiaries, including Merrell Dow Pharmaceuticals, thus increasing Dow's tax liability.  At the same time, in 1992, the Department also issued notices of deficiency for the year 1990 to Marion Merrell Dow and Merrell Dow Pharmaceuticals and assessed penalties against Marion Merrell Dow for failure to file an Illinois income tax return for the year 1990.

Dow and Merrell Dow Pharmaceuticals protested the deficiencies for the year 1990.  Upon a re-audit of the matter, the Department determined that Marion Merrell Dow and Merrell Dow Pharmaceuticals did not independently have a nexus with Illinois and, therefore, could not be subject to Illinois taxation unless they were part of Dow's "unitary business group."  Because of the Department's position that in the year 1990 Marion Merrell Dow and Merrell Dow Pharmaceuticals were part of Dow's "unitary business group," the Department let the deficiency against Dow (but not against Marion Merrell Dow and its subsidiaries) stand.  Dow sought an administrative hearing.

In 1996, the Department issued another notice of deficiency to Dow, this time for the years 1991 through 1993.  The deficiency was based, in part, on the Department's determination that Marion Merrell Dow and its subsidiaries, including Merrell Dow Pharmaceuticals, should be included in Dow's "unitary business group" for the years 1991 through 1993.  Dow, again, protested the deficiency.  The administrative appeal of the year 1990 deficiency was consolidated with the appeals for the years 1991 through 1993.

The Formation of Marion Merrell Dow

In 1981, one of Dow's newly created subsidiaries merged with Richardson-Merrell, Inc. (Richardson-Merrell).  Richardson-Merrell had been engaged in the manufacture and marketing of prescription and over-the-counter pharmaceuticals and medicines; consumer health products and toiletries; and chemical, diagnostic, nutrition and wood care products.  The resulting Dow subsidiary became Merrell Dow Pharmaceuticals, a Delaware corporation with its principal place of business in Cincinnati, Ohio.  It took over Richardson-Merrell's prescription and over-the-counter pharmaceutical business.  The remainder of Richardson-Merrell's former business was spun off and did not become part of Merrell Dow Pharmaceuticals.  From March of 1981 to December of 1989, Dow directly or indirectly owned 100% of Merrell Dow Pharmaceuticals' outstanding shares of stock.  

In December of 1988, Dow's executives sought to diversify its business.  Dow and Marion Laboratories, Inc. (Marion Laboratories), a publicly held Delaware corporation with its principal place of business in Kansas City, Missouri, entered into negotiations concerning Merrell Dow Pharmaceuticals.  Marion Laboratories and its subsidiaries were involved in the development, manufacture and sale of pharmaceutical, hospital and laboratory products.  In 1989, Dow and Marion Laboratories entered into a stock acquisition agreement, whereby Dow acquired 67% of Marion Laboratories' common stock and Marion Laboratories received cash and all of Dow's outstanding shares of Merrell Dow Pharmaceuticals.  The merger became complete in December of 1989. 

After the merger, Marion Laboratories changed its name to Marion Merrell Dow.  Its headquarters remained in Kansas City.  Pursuant to an employee transfer agreement, employees of Merrell Dow Pharmaceuticals remained Dow employees from November 30, 1989, through 1990 but were considered "loaned" to Marion Merrell Dow.  This arrangement allowed the employees to continue participating in Dow's benefit plans.  Marion Merrell Dow reimbursed Dow for all such benefit plan expenses.

Dow's Further Acquisition of Shares in Marion Merrell Dow

During 1990, through additional purchases of shares, Dow's interest in Marion Merrell Dow went up to 68.8%, with Dow owning 47.6% of the shares directly and 21.2% of the shares indirectly through its wholly owned subsidiary, RH Acquisition Corp. (RH Acquisition).

During 1991, Dow continued to purchase additional shares, and its interest in Marion Merrell Dow climbed to 70.01% by the end of the year.  Dow owned 20.56% of the shares directly; RH Acquisition owned 22.31%, and Dow Holdings, Inc. (Dow Holdings), Dow's second-tier subsidiary, owned 27.14%. 

During 1992, the acquisition of additional shares continued.  As a result, by the year's end Dow's interest in Marion Merrell Dow climbed to 71.03%, with Dow owning 23.29% of the shares directly, RH Acquisition owning 20.39%, and Dow Holdings owning 27.35%.

By the end of 1993, Dow's interest in Marion Merrell Dow became 71.83%, with Dow owning 24.06% of the shares directly, RH Acquisition owning 20.41%, and Dow Holdings owning 27.36%.

Common Officers and Directors

In the months preceding the merger, four Dow directors and two employees of Dow/Merrell Dow Pharmaceuticals joined the Marion Laboratories' board of directors.  During the period from 1990 through 1993, 17 of Marion Merrrell Dow's 37 executive officers were former officers of Merrell Dow Pharmaceuticals, including, in Marion Merrell Dow's first two years of existence, its chief executive officer (CEO).  Marion Merrell Dow's second chief executive officer contemporaneously joined Dow's board of directors.  During this four-year period, a total of six Dow directors were also Marion Merrell Dow directors, including as many as five directors at the same time serving on both boards.
(footnote: 2)  Among Marion Merrell Dow's directors were Dow's president and CEO, Dow's vice-president, Dow's financial vice-president and CEO, and Dow's executive vice-president of technology.

Post-Merger Financial Transactions Between Dow and Marion Merrell Dow

In May of 1991, Dow's board of directors approved a $70 million loan by its wholly owned Canadian subsidiary to Nordic Laboratories, Inc., a wholly owned subsidiary of Marion Merrell Dow, so that it could repurchase its own shares.

In October of 1993, Dow, at the request of Marion Merrell Dow, issued a $200 million guaranty of Marion Merrell Dow's obligations in connection with a European venture, known as Carderm Capital L.P., for marketing an antismoking product.  Dow's letter of resolution authorizing the guaranty explained that it would "permit [Marion Merrell Dow] to obtain investments in Carderm at a lower financial cost and realize the benefits of off-balance sheet financing."  In consideration of the guaranty, Marion Merrell Dow agreed to pay Dow $1 million.

For its part, Marion Merrell Dow regularly loaned large sums of money to Dow on a very short-term basis at the end of each year.
(footnote: 3)  The loan notes bore interest based on the prevailing market rate.  The loans enabled Dow to improve the appearance of its publicly issued financial statements by temporarily paying down debt to unrelated parties, thereby reducing debt-to-equity ratio on a consolidated basis.  Marion Merrell Dow also had forward exchange contracts with Dow to hedge foreign currency loans, ranging from $31 million to $107 million during 1991 through 1993.

Dow's Oversight of Marion Merrell Dow's Business

The members of Dow's management committee regularly met with Marion Merrell Dow's representatives.  Among other things, Dow's president and CEO attended eight meetings of Marion Merrell Dow's board of directors, and Dow's financial vice-president and CEO attended at least six Marion Merrell Dow board meetings, including one scheduled to discuss future organization, personnel requirements, and financial strategy.  Dow's vice-president for public affairs visited Marion Merrell Dow in 1991 to discuss contacts and strategy.  Dow's Environment, Health & Safety Committee frequently reviewed Marion Merrell Dow's safety performance.  When Dow filed mandatory reports regarding its workplace safety record, it included data concerning Marion Merrell Dow's employees.

Two of Dow's directors who also served on Marion Merrell Dow's board of directors regularly reported to Dow's board regarding Marion Merrell Dow's activities during the years at issue.  These reports were not limited to merely financial matters, but also covered Marion Merrell Dow's operations, business strategy and the status of its pharmaceutical products.  The topics reported also included Marion Merrell Dow's: global strategy; the loss of a state court proceeding regarding the drug Bendectin; the insider trading policy for its directors; developments in the international area, global marketing concept changes, refinements and improvements in organizational effectiveness; review of financial data, development, support programs and strategic goals for major products; review of workforce reduction and its impact on research and development efforts in Cincinnati and Kansas City; discussion of senior management changes; and strategy of successfully doing business in health care.

Marion Merrell Dow and its subsidiaries were expressly excluded from the coverage of Dow's corporate authorization policy and had their own authorization policies.
(footnote: 4) 

Dow's Provision of Post-Merger Services and Benefits to Marion Merrell Dow

Dow entered into service agreements with Marion Merrell Dow and Merrell Dow Pharmaceuticals.  The agreements were in effect from December 2, 1989, through 1993.  Dow committed to providing Marion Merrell Dow and Merrell Dow Pharmaceuticals with a variety of services, including: manufacturing services; accounting, financial, statistical, treasury, tax and risk management services; internal audit services; legal consultation services; technical services; research services; information management services; equipment leasing services; and environmental waste disposal services.  The agreements also made Dow a special agent for Marion Merrell Dow, granting Dow limited authority to enter into contracts on Marion Merrell Dow's behalf and permitting Dow to use Marion Merrell Dow's letterhead and forms for transactions related to such services. 
 

During the tax years at issue, Dow provided many of those services to Marion Merrell Dow, including: miscellaneous tax services; audit services of Marion Merrell Dow's foreign subsidiaries; legal services in the areas of financial law, mergers and acquisitions, and general internal matters; database support for Marion Merrell Dow's patents and applications; various patent- and trademark-related administrative services; quality performance courses; a purchasing seminar; safety services; transportation services; public affairs services; computer support services; and personnel-related services and benefits, including insurance for the employees.  Marion Merrell Dow and its subsidiaries paid Dow for the services under the agreed-upon scale.

Marion Merrell Dow's Business

During the years at issue, Marion Merrell Dow and its subsidiaries operated exclusively in one industry segment—pharmaceuticals—and maintained three business units: a Prescription Products Division, a Consumer Products Division and an International Division.  Marion Merrell Dow and its subsidiaries were involved in the development, manufacture and sale of prescription and over-the-counter pharmaceutical products, as well as products for hospital use.  Their product base was concentrated in cardiovascular, respiratory and gastrointestinal healthcare.  

The Merrell Dow Research Institute (the Institute), located in Cincinnati, Ohio, had coordinated and directed the activities of Merrell Dow Pharmaceuticals' research centers in Cincinnati; Indianapolis, Indiana; Strasbourg, France; Gerenzano, Italy; Winnersch, United Kingdom; and Hirkata, Japan.  After Merrell Dow Pharmaceuticals' acquisition by Marion Laboratories, the Institute continued to focus on the discovery, development and registration of new products, as well as on the modifications of existing products. 

Marion Merrell Dow had a compound-sharing arrangement with Dow and DowElanco, a 60%-owned indirect subsidiary of Dow.  Pursuant to the arrangements, Marion Merrell Dow, Dow and DowElanco agreed that chemical compounds developed by any of them would be made available, subject to appropriate licensing and legal arrangements, to Marion Merrell Dow for pharmaceutical applications and to Dow and DowElanco for industrial and agricultural applications, respectively.  Marion Merrell Dow also had a collaborative research agreement with Dow in connection with an anti-HIV project.

Marion Merrell Dow had shared-research agreements with unrelated parties, as well, including Nova Pharmaceutical Corporation, Affymax N.V. and Scios Nova, Inc., concerning the development and marketing of new pharmaceutical products for cardiovascular, respiratory and autoimmune diseases, Alzheimer's disease, arthritis, cancer, and other diseases.  Marion Merrell Dow also entered into joint venture, licensing and marketing agreements with unrelated companies to develop, produce and market pharmaceutical products, including: an agreement to co-develop Nicoderm with Alza Corporation; a strategic alliance with Alteon, Inc. (Alteon) to develop and commercialize Alteon's technology for therapeutics in the areas of diabetic and aging complications; an agreement with ImmuLogic Pharmaceutical Corp. (ImmuLogic) to develop and commercialize ImmuLogic's Allervax family of allergy therapeutics; an agreement with SmithKline Beecham to develop and market over-the-counter pharmaceutical products; a collaborative research and license agreement with Oncogene Science, Inc., to develop new pharmaceutical products for the treatment of heart disease, hypertension and stroke; an agreement to purchase exclusive marketing rights from Toray Industries, Inc., for a cardiovascular disease drug; a license of Nicorette from Pharmacia Leo, the developer of Nicorette; and a license of compounds designed for the treatment of chronic cardiovascular disease from Gensia Pharmaceuticals, Inc. 

Dow's Sale of Chemical Ingredients to Marion Merrell Dow

As noted, Marion Merrell Dow's operations were not confined to research, development and marketing.  Marrion Merrell Dow and its subsidiaries also engaged in the manufacturing of pharmaceuticals.  After the merger, pursuant to an agreement between Dow and Merrell Dow Pharmaceuticals dated January 1, 1990, Dow continued to manufacture and supply a number of active and inactive pharmaceutical ingredients to Merrell Dow Pharmaceuticals for the use in the manufacture of its pharmaceutical products.  The agreement contained the following pertinent recitation:

"Whereas, when it was a subsidiary of Dow, [Merrell Dow Pharmaceuticals] purchased chemical drug substances from Dow to enable it to carry on its business in the ordinary course, and, to ensure that it will continue to carry on its business in the ordinary course efficiently, effectively and without disruption in its operations as it undergoes what it deems to be a transition period from being a Dow subsidiary to becoming a subsidiary of [Marion Merrell Dow], [Merrell Dow Pharmaceuticals] desires to continue to purchase *** chemical drug substances from Dow."

Pursuant to the agreement, the manufacturing of the pharmaceutical ingredients was to take place at Dow's Midland, Michigan, manufacturing complex.  The pricing of the pharmaceutical ingredients was based on "the lowest available U.S. market price" or a "mutually agreed" price.

From 1990 through 1993, Dow was Marion Merrell Dow's sole supplier of the active ingredient for the drug Lorelco.  Marion Merrell Dow's filings with the Securities and Exchange Commission in 1990 through 1993 state that the loss of Dow as a source of supply to Marion Merrell Dow would have a "material adverse effect" on its business.

Dow's Sale of Facilities within Midland Pharmaceutical Manufacturing Complex 

to Marion Merrell Dow

In 1991, Dow began construction of a new multiproduct pharmaceutical plant within its Midland complex.  At about the same time, Dow was also constructing a  "pilot plant" for producing clinical drug substances.  On April 1, 1992, Merrell Dow Pharmaceuticals purchased both plants from Dow, along with several adjacent manufacturing and research-related facilities.  In addition, Merrell Dow Pharmaceuticals purchased the facilities' equipment, raw materials, work in progress and finished inventories.  Pursuant to the purchase agreement, Dow leased to Merrell Dow Pharmaceuticals the underlying land for $1 a year for a term of 40 years.  Dow was to complete the construction and have the multi-product plant operational on or about April 1, 1994 and the "pilot plant" operational on or about December 1, 1993.

Contemporaneously with the purchasing agreement, Dow and Merrell Dow Pharmaceuticals entered a manufacturing agreement, whereby Dow would operate the facilities purchased by Merrell Dow Pharmaceuticals.  Dow also agreed to act as Merrell Dow Pharmaceuticals' agent in dealing with regulatory agencies and authorities, to enter into certain contracts and negotiations in Merrell Dow Pharmaceuticals' name, and to administer such contracts.  

Marion Merrell Dow's Sale of Its Toxicology Lab to Dow

Pursuant to a December 1993 agreement between Dow and Marion Merrell Dow, Dow acquired Marion Merrell Dow's toxicology laboratory and became Marion Merrell Dow's exclusive supplier of toxicology studies and services.  Marion Merrell Dow guaranteed Dow minimum fees for the first two years of $7.5 million and $6 million, respectively.  As was the case with other agreements, Dow was granted limited authority to enter into contracts on behalf of Marion Merrell Dow and to use Marion Merrell Dow's letterhead in connection with the contracts.  Dow was given an option to offer employment transfers to any of the lab's employees whom Dow chose to employ.

II.  
The Administrative Proceeding

The matter was tried before an administrative law judge (ALJ).  In addition to the foregoing stipulated facts, the following testimony was adduced.  

Dow Employees and Former Employees

Enrique Falla had been with Dow since approximately 1966 and on Dow's board of directors since 1985.  Between 1985 and 1989, Falla was Dow's financial vice-president; between 1989 and 1991, he was chief financial officer; and in 1991, he became executive vice-president while still remaining chief financial officer.  

Falla described the nature of Dow's business as follows.  Dow was in the business of producing and selling chemicals and plastic products.  Dow primarily sold bulk chemicals to large enterprises involved in the manufacture of durable goods.  Examples of such enterprises included housing, construction and aerospace industries.  Dow also manufactured and sold "fine" chemicals to a series of other manufacturers, including the pharmaceutical industry.  "Fine" chemicals are additives that go into a variety of food and health products.  Prior to the merger, Merrell Dow Pharmaceuticals manufactured and sold finished pharmaceutical products, 
i.e.
, tablets and capsules for direct consumption by the patient.  Merrell Dow Pharmaceuticals had a separate corporate culture from Dow.  Merrell Dow Pharmaceuticals was "research intensive," whereas Dow was "capital intensive"; Merrell Dow Pharmaceuticals produced millions of tablets and capsules which it sold to numerous customers, whereas Dow manufactured quantities of chemicals measured in truckloads and tank cars which it sold to a limited number of volume purchasers.  

Falla stated that prior to the merger, the shared functions between Dow and Merrell Dow Pharmaceuticals included: "the legal department, finance, treasury, [and] insurance."  The research and development division of Merrell Dow Pharmaceuticals and its other core departments reported to Dow.  After the merger, Marion Merrell Dow was a self-sufficient independent entity.  Marion Merrell Dow had its own board, authorization and delegation policies, and accounting practices and procedures.  No functions—such as research and development, product lines, advertising, marketing and capital investment, accounting, auditing, purchasing, financing, insurance, legal, tax compliance, or personnel—were consolidated between Marion Merrell Dow and Dow.  None of the divisions of Marion Merrell Dow reported to Dow.  Prior to the merger, Dow manufactured those finished pharmaceuticals "that were sold by Merrell Dow [Pharmaceuticals]."  After the merger, Dow did not manufacture finished pharmaceuticals and had very little to offer to Marion Merrell Dow by the way of "pharmaceutical competency."

Falla was responsible for all financial functions at Dow, including treasury, taxes, mergers and acquisitions, and investor relations.  Between 1990 and 1993, Falla held dual directorships at Dow and Marion Merrell Dow, but held no executive or management position at Marion Merrell Dow.  His responsibilities as a director of Marion Merrell Dow were generically to represent the shareholders' interests. 

Regarding the composition of Marion Merrell Dow's board of directors and its independence from Dow, Falla explained that pursuant to the merger agreement, Dow was limited to having no more than three of its employees on the Marion Merrell Dow's board of directors.  As a result, most of the time, three employees of Dow were directors of Marion Merrell Dow, but "for a period of time," only two employees of Dow were directors of Marion Merrell Dow.
(footnote: 5)  The reason for the limitation was to give Marion Merrell Dow and its board independence from Dow in its decision-making.  With only three directors, Dow could not unduly influence the board (comprised of 12 directors).  The remainder of Marion Merrell Dow's directors consisted of employees of Marion Merrell Dow and outside directors.  Falla admitted that at one point  during the years at issue, Dow and Marion Merrell Dow had five directors in common.  He also noted that Marion Merrell Dow had five independent directors with no connections to Dow or Marion Merrell Dow.  According to Falla, no Dow officer or employee had any involvement in the direction of Marion Merrell Dow—"a Dow officer is a Dow officer, and a Marion Merrell Dow officer is a Marion Merrell Dow officer.  There is no reportability between the two."  Falla admitted to visiting Marion Merrell Dow facilities for board meetings, but denied any conduct beyond that needed to fulfill his duty of care as a director and denied any involvement in Marion Merrell Dow's operations.  In his capacity as a director, Falla on several occasions gave advice to Marion Merrell Dow's chief financial officer, but his advice was not followed.

Falla further explained that independence from Dow was critical to the spin-off of Merrell Dow Pharmaceuticals and its merger with Marion Laboratories because the idea behind the spin-off and merger was to enhance value for all shareholders.  Because Marion Merrell Dow was a publicly held company with a 30% minority interest, Dow, as the majority shareholder, anticipated enhancement in the value of Marion Merrell Dow due to its (pharmaceutical) stock's higher valuation as compared to chemical stock.  Falla explained that for each $1 of a pharmaceutical company's earnings, its stock would be valued significantly higher than a chemical company's stock per $1 in earnings.  No enhancement in the value would occur were the market to perceive that Marion Merrell Dow was an alter ego of Dow because of concern that Dow would divert pharmaceutical profits to subsidize its chemical main line of business.  Falla further stressed that because Marion Merrell Dow's stock was publicly traded, Dow sought to avoid potential conflicts of interest between it, as the majority shareholder, and the minority shareholders.  For that reason, Dow-employee directors of Marion Merrell Dow did not vote as a block. 

Falla admitted that Marion Merrell Dow was part of Dow's consolidated financial statements, but explained that it was because of the accounting rules, as Dow was the majority shareholder in Marion Merrell Dow.
(footnote: 6)  Marion Merrell Dow was regarded a material part of Dow because Dow's sales to Marion Merrell Dow "were close to 20% of the consolidated sales."
(footnote: 7) 
 
Falla also confirmed that, for a number of years, Dow borrowed money from Marion Merrell Dow on a short-term basis at the end of the year to improve its financial appearance.  Marion Merrell Dow was repaid in five to seven days, paid market rate interest, plus "maybe one eighth additional incentive."  The benefit to Marion Merrell Dow was the premium of one-eighth in interest and a low-risk nature of the transaction.

Regarding the service agreements between the companies, Falla stated that the underlying purpose was to buy services from one another on a competitive basis.  All agreements were reviewed by the Marion Merrell Dow's audit committee.  Falla, as a member of the audit committee, reviewed the agreements and rendered opinions as to the fairness of the price, but had no vote with respect to the approval.  In Falla's opinion, the agreements were more favorable to Marion Merrell Dow than to Dow.

Lastly, regarding the construction and sale of Midland's pharmaceutical manufacturing and research facilities to Marion Merrell Dow and Dow's subsequent operation of the facilities, Falla stated that such an arrangement is not uncommon for bulk chemical giants.  Dow had done the same for Amoco in connection with an ethylene facility in the Netherlands and for unrelated chemical companies in Canada.  Dow also operated a facility for the United States Department of Energy on a contract basis.

John Tysse testified that he had been with Dow since 1967.  In 1986, he became a director of marketing for Dow's United States chemicals and metals division.  Between 1990 and 1994, Tysse served as vice-president of sales and marketing for the chemicals and performance products division.  He explained that Dow had been called "the chemical companies' chemical company" because a very large percentage of Dow's sales were sales of basic chemicals and chemical intermediates to other chemical companies.  Examples of chemicals sold to chemical companies included chlorine, caustic soda
(footnote: 8) products like glycerin, and ethylene glycol.  Dow's second-largest customer of basic chemicals was the pulp and paper industry.  The pulp and paper customers bought caustic soda and large quantities of styrene, butadiene and latex.  Other large customers included packaging companies, which bought plastic granules; food processing companies, which bought food thickeners such as methylcellulose; personal care companies, which bought chemicals used in various kinds of personal care products; metal working companies, which bought large amounts of caustic soda and chlorinated solvents; and dry cleaning companies, which bought a chlorinated solvent called perchlorethylene.  The pharmaceutical industry was also a customer of Dow; however, because the pharmaceutical industry was not a large-volume buyer, sales were usually made through a third-party distributor.  Examples of chemicals sold to the pharmaceutical industry included propylene glycol, polyethylene glycol and ion exchange resin.

Tysse explained that Dow and Marion Merrell Dow were completely different businesses because their products were different and so was the customer base.  There was no commonality or synergy between the two businesses.  Dow was selling its products to a few very large customers.  A typical pharmaceutical company such as Marion Merrell Dow would sell to perhaps hundreds of physicians.  For these reasons and so as "not [to] contaminate the pharmaceutical business with old chemical company thinking," Dow assumed no responsibility for Marion Merrell Dow's sales and marketing.  There were no exchanges of sales and marketing personnel between Dow and Marion Merrell Dow, no co-promotion arrangements and no common marketing strategies.  No Marion Merrell Dow personnel reported to Tysse or anybody else in his group.

Tysse admitted that he was unfamiliar with the movement of products between Dow and Marion Merrell Dow because that area was not a part of the sales and marketing efforts for which he was responsible.  However, David Claude Price, a section manager in the area of manufacturing of pharmaceutical chemicals, testified that, in dollar terms, during the years at issue Dow provided between 15% and 20% of Marion Merrell Dow's active pharmaceutical ingredients or, stated differently, approximately 4% of all ingredients, active and inactive.

William Dowd, PhD., testified that he had been with Dow since 1970.  During the years at issue, Dr. Dowd was a director of the organic chemicals and polymers laboratory and the biotechnology laboratory.  Dow had other research laboratories in catalysis, inorganic chemistry, interfacial science, electronics and ceramics.  The laboratories were collectively referred to as "central research."  The major purpose of central research was to develop new technology for Dow's existing divisions.  Neither Marion Merrell Dow nor any of the other subsidiaries of Dow had any involvement with respect to the research budget, nor, unlike Dow's divisions, were they required to contribute funds towards the research budget.  

Prior to the merger, Dow's central research provided services to Merrell Dow Pharmaceuticals in connection with anti-HIV research.  Dr. Dowd described the arrangement at that time as informal and collaborative.  After the merger, Dow instructed its research directors to formalize the research arrangement with Marion Merrell Dow.  Research directors were also instructed by Dow's legal department to protect Dow's proprietary interests in the interactions with Marion Merrell Dow because it was a separate company.  Dow and Marion Merrell Dow negotiated a contract, pursuant to which central research continued to provide to Marion Merrell Dow services in connection with the anti-HIV project.  Marion Merrell Dow was to pay Dow half a million dollars based on Dow's delivery to it of certain quantities of potential drug candidates.  Dr. Dowd noted that subsequently there arose a disagreement between Dow and Marion Merrell Dow as to patent ownership of the discovered compounds.

Karen Beckwith, an attorney, testified that she started working for Dow in 1981.  In 1983, she was transferred to Merrell Dow Pharmaceuticals and worked on certain litigation involving its drug Bendectin and in the area of employment law.  In 1991, Beckwith transferred back to Dow.
(footnote: 9) 

Beckwith was one of the attorneys working on the employee transfer agreement in connection with the merger, pursuant to which employees of Merrell Dow Pharmaceuticals remained Dow employees from November 30, 1989, through 1990 but were considered "loaned" to Marion Merrell Dow.  Beckwith explained that the purpose of the agreement was to allow the employees of Merrell Dow Pharmaceuticals to continue in Dow's benefit plans during the transitional period after the merger.  After the transitional period, the employees of Merrell Dow Pharmaceuticals received their benefits through Marion Merrell Dow.  

Regarding post-merger changes in the corporate hierarchy, Beckwith stated that management-level personnel at Merrell Dow Pharmaceuticals had to move to Kansas City, the headquarters of Marion Merrell Dow.  Overall, "there was a whole different way of doing things."  After the merger, Beckwith no longer looked to Dow for policy direction and information but, rather, looked to Marion Merrell Dow.  

After Beckwith went back to Dow in 1991, she no longer had any responsibility for Merrell Dow Pharmaceuticals or Marion Merrell Dow.

Marion Merrell Dow Employees and Former Employees

Frederick W. Lyons had been with Marion Merrell Dow and its predecessor, Marion Laboratories, since 1970.  Between 1970 and 1974, he was president of the pharmaceutical division.  In 1974, Lyons became executive vice-president and chief operating officer of Marion Laboratories and, in 1977, he became president and chief operating officer.  In 1984, Lyons became chief executive officer.  Between 1970 and 1989, he was on the board of directors.  After the merger, Lyons became president of Marion Merrell Dow and one of its directors.  During the years at issue, Lyons also served on Dow's board of directors.  In January of 1992, Lyons became a CEO of Marion Merrell Dow and continued in that position until January of 1994.

Lyons stated that the success in a pharmaceutical industry is built around investing in developing a unique product for a specific patient need and selling the product in a way so as to get a good return on the investment.  Correspondingly, the primary focus of Marion Laboratories was on the end users of the pharmaceutical products, namely, the patients, and the primary asset of Marion Laboratories was its employees.  Marion Laboratories' corporate culture treated the employees as members of the team, rather than in terms of their place in the hierarchy.  An important post-merger goal was to foster the same corporate culture at Marion Merrell Dow.  The Kansas City team of Marion Laboratories was to be the focus point and the core of the new company.  No one from Dow was involved in building a new corporate structure and culture at Marion Merrell Dow.

Marion Merrell Dow and Dow did not have any executive officers in common.  A number of executive officers at Marion Merrell Dow, however, were former Dow employees.  After Marion Merrell Dow came into being, executive officers were chosen by a search committee and approved by Marion Merrell Dow's board of directors.  No approval was sought from Dow's board.

In regard to the composition of Marion Merrell Dow's board of directors, Lyons stated that two of Marion Laboratories' independent directors, Dr. John Beils, dean of pharmacy at the University of Southern California, and Dr. James Gardener, professor of business administration and former dean of the University of Utah Graduate School of Business, carried over onto Marion Merrell Dow's board.  During the years at issue, additional outside directors were added: Dr. James Weingarten, former director of the National Institute of Health, Paul Rogers, a retired chairman of the United States House of Representatives subcommittee on health, and Dr. Gayle Wolinski, former director of the health care financing administration.  Lyons' testimony paralleled Falla's in respect to Marion Merrell Dow being an independent publicly held company run for the benefit of all shareholders, and Dow, therefore, being allowed to have only three of its employees on Marion Merrell Dow's board of directors, despite having 70% of the stock.  Dow employees on the board did not vote as a block.

Dow had no representatives on Marion Merrell Dow's executive committee, which was empowered to take action on behalf of Marion Merrell Dow's board of directors when the board was not in session.  Aside from Falla, who was a nonvoting member of the audit committee, Dow had no other representatives on Marion Merrell Dow's other board committees.  According to Lyons, Dow had "nothing to do with" the management of Marion Merrell Dow.  

In terms of sources of active pharmaceutical ingredients, Lyons stated that Dow was Marion Merrell Dow's second-largest supplier.

Richard J. Bailey testified that he was a managing director and vice-president of worldwide research and development at Marion Merrell Dow from the time of the merger in late 1989 until December of 1991.  Subsequently, until March of 1995, he was head of corporate human resources for the worldwide business at Marion Merrell Dow.  Before the merger, from 1985 until late 1989, Bailey was employed by Marion Laboratories—first, until fall of 1988, as a director of human resources for the United States sales and marketing division, and then as a director of human resources for the research and development division.  

Bailey noted the differences in the corporate cultures of Marion Laboratories and Dow.  The needs of Marion Laboratories, as a pharmaceutical company, were "largely around people and talent."  In contrast, Dow, as a chemical company, was employing a very high-volume, low-cost and low-margin strategy, where the competitive advantages came from process improvement,
(footnote: 10) technology, and decisions made around capital and equipment.  In terms of recruiting new personnel, Marion Merrell Dow focused on individuals with science or pharmacy backgrounds, while Dow focused on individuals with engineering backgrounds.  At Marion Laboratories, the rank-and-file employees had significantly more input into decision-making than their Dow counterparts.  After the merger, the decision-making patterns at Marion Merrell Dow reflected those of Marion Laboratories and not of Merrell Dow Pharmaceuticals or Dow. 

Bailey further noted that post-merger, all of the corporate decision-making and reporting at Marion Merrell Dow was contained within the Marion Merrell Dow structure.  No one reported to Dow.  To Bailey's knowledge, Marion Merrell Dow was also self-sufficient in its corporate support needs.  Bailey was unaware of any administrative functions that Dow performed for Marion Merrell Dow.  The corporate support structure for Merrell Dow Pharmaceuticals came not from Dow, but from Marion Merrell Dow headquarters in Kansas City.  The compensation and benefits programs at Marion Merrell Dow reflected the Marion Laboratories' policies and not those of Dow. 

Denise C. Lynch testified that prior to the merger she was a manager of disbursements at Marion Merrell Dow.  In the fall of 1989, she became director of accounting services.  Lynch's responsibilities included accounts payable, payroll, benefits accounting, travel and expense reporting, noninventory purchasing, general accounting, and revenue accounting.  In 1991, Lynch became controller of the United States operations at Marion Merrell Dow.  As a controller, she was responsible for planning and forecasting in the commercial sales distribution area.  Immediately post-merger, Lynch was involved in the drafting of Marion Merrell Dow's corporate authorization policy.  Lynch explained that an authorization policy is a policy that describes every possible business transaction and designates which employees can authorize what transactions.  Dow did not provide any guidance, nor were any Dow employees involved with respect to drafting the authorization policy.  The draft authorization policy was circulated internally within Marion Merrell Dow; it was not circulated to any Dow employees.  The policy was not adopted until mid-1990.  No transaction in the authorization policy required approval by Dow's board of directors.  With respect to the short-term loans to Dow, the authorization policy provided that the loans be transacted at arm's length, be properly documented, Marion Merrell Dow receive market interest rates, and Marion Merrell Dow have the right to refuse to make the loan.  

Lynch further testified that no bank accounts were shared between Dow and Marion Merrell Dow, and Dow had no access to Marion Merrell Dow's bank accounts.  No functions were consolidated between Dow and Marion Merrell Dow, and no one at Marion Merrell Dow reported to Dow.  As to the administrative service contracts, less than 1% of Marion Merrell Dow's service contracts were for services from Dow.

Expert Testimony

Charles Murdock, professor of law at Loyola University, was called as an expert in the areas of corporate structures and fiduciary obligations of directors.  Professor Murdock stated that there was a "very heavy" constituency of independent directors on Marion Merrell Dow's board, which indicated the independence of Dow and Marion Merrell Dow.  Also, the lack of overlapping officers between Dow and Marion Merrell Dow indicated Dow's lack of control over Marion Merrell Dow.  Similarly, after reviewing Dow's and Marion Merrell Dow's separate corporate authorization policies, Professor Murdock stated that the policies indicated that the two companies functioned independently.

Dow also called Dr. George Carlson, an economist, to offer an opinion as to whether the transactions between Dow and Marion Merrell Dow were conducted at arm's length.  Dr. Carlson testified that they were at arm's length.  On cross-examination, however, he admitted that his opinions were based, in large part, on one conversation with Falla.  Because Dr. Carlson did not review the board minutes, committee minutes, audit comments or other pertinent documents, the ALJ ruled that his opinion was based on incomplete evidence and could not be afforded much weight.  Dow does not dispute this ruling on appeal.

The ALJ's Recommendation

The ALJ found that Dow, Marion Merrell Dow and their respective subsidiaries were engaged in a unitary business during the tax years at issue and recommended a decision in favor of the Department for all the years at issue.  Specifically, the ALJ found that the unitary business relationship here was established because the companies were related through common ownership; were in the same general line of business, namely, pharmaceutical manufacturing, research and development; were vertically integrated; and were functionally integrated through strong centralized management.

The Department adopted the ALJ's recommendation.

III.  Administrative Review

On administrative review, the circuit court upheld the ALJ's finding of a unitary business relationship between Dow and Marion Merrell Dow for the year 1990, but reversed the findings for the years 1991 through 1993 as clearly erroneous or, in the alternative, as against the manifest weight of the evidence.

The Department appeals the circuit court's judgment with respect to the years 1991 through 1993, and Dow appeals the judgment with respect to the year 1990.
  For the reasons discussed below, we agree with the circuit court.

ANALYSIS

On appeal from an administrative review proceedings, this court reviews the decision of the administrative agency, not of the circuit court.  
JM Aviation, Inc. v. Department of Revenue
, 341 Ill. App. 3d 1, 9, 791 N.E.2d 1152, 1158 (2003).  The parties are in disagreement as to the applicable standard of review.  Dow contends that the legal effect of a given set of facts is a question of law
 and, therefore, the 
de novo
 standard of review applies here. 
 
The Department, on the other hand, contends that the clearly erroneous standard of review applies.

In 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 692 N.E.2d 295 (1998), the supreme court was presented with the question of whether the city's decision to contract out paramedic services to a private company constituted a mandatory subject of collective bargaining.  The supreme court explained that its standard of review turned on whether the issue before it was properly characterized as solely a question of law, 
solely a question of fact, or a mixed question of law and fact.
  If the issue presented purely a 
question of law, the standard of review would be 
de novo
; if the issue involved solely the 
agency's factual determinations, the standard of review would be whether the findings of fact were against the manifest weight of the evidence; and if the issue presented 
mixed questions of law and fact, the standard of review would be whether the decision was clearly erroneous.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d 
at 302. 
 The court ultimately decided that the issue before it could not be accurately characterized as involving solely a question of law or a question of fact, but, rather, was a mixed question of law and fact:

"The Board's finding is, in part, factual because it involves considering whether the facts in this case support a finding that the City's decision affected wages, hours and other conditions of employment.  Nevertheless, the Board's finding also concerns a question of law because the phrase 'wages, hours and other conditions of employment' is a legal term that requires interpretation."  
City of Belvidere
, 181 Ill. 2d at 205
, 692 N.E.2d 
at 302
. 
 

Dow, however, contends that the existence of a "unitary business group" on the facts of this case is solely a question of law because the Department was not required to draw any additional factual findings from the evidence.  In support, Dow relies on 
Blessing/White, Inc. v. Zehnder
, 329 Ill. App. 3d 714, 768 N.E.2d 332 (2002).  In 
Blessing/White
, the issue before the Department was whether the corporation's gain from the sale of its assets constituted business income.  
Blessing/White
, 329 Ill. App. 3d at 727-28, 768 N.E.2d 
at 343.  During the administrative proceedings, the parties stipulated to all material facts and exhibits.
  
Blessing/White
, 329 Ill. App. 3d at 717, 768 N.E.2d 
at 335
. 
 This court decided that because the underlying facts were stipulated to and the Department was not required to "draw any additional findings from the evidence," the facts were undisputed and, therefore, the issue before the court was solely a question of law subject to 
de novo
 review.  
Blessing/White
, 329 Ill. App. 3d at 728-29, 768 N.E.2d 
at 343
.

Dow's reliance on 
Blessing/White
 is misplaced.  
Blessing/White
 is distinguishable because the nature of the evidence and the question presented did not require the administrative agency to make intermediate inferences and factual conclusions from the evidence.  
Here, unlike in 
Blessing/White
, 
multiple witnesses testified over the course of several days to many aspects of Dow's and Marion Merrell Dow's operations.  
The ALJ and the Department had to draw on their administrative expertise to make intermediate findings of fact from the testimonies of these multiple witnesses (as well as from the stipulations of fact)—such as 
whether the companies were related through common ownership, whether they were in the same general line of business, and whether they were functionally integrated through strong centralized management—before they could determine whether 
a "unitary business group" 
existed.
  Moreover, the characterization of the issue in 
Blessing/White
 as involving solely a question of law is suspect insofar as it may be inconsistent with the federal definition of a mixed question of law and fact cited with approval by our supreme court in 
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 391, 763 N.E.2d 272, 279 (2001), where the court stated:

"a mixed question [of law and fact] is one 'in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or *** whether the rule of law as applied to the established facts is *** violated,' " quoting 
Pullman-Standard v. Swint
, 456 U.S. 273, 289 n. 19, 72 L. Ed. 2d 66, 80 n. 19, 102 S. Ct. 1781, 1790 n. 19
 (1982). 

The instant case, accordingly, presents a mixed question of law and fact.
  See 
Hormel Foods Corp. v. Zehnder
, 316 Ill. App. 3d 1200, 1204-05, 738 N.E.2d 145, 149 (2000), relying on 
City of Belvidere
, 181 Ill. 2d at 205
, 692 N.E.2d 
at 302
 ("The ALJ's finding is factual, in part, because it involves considering whether the facts in this case support a finding that [t]axpayers participated in a unitary business.  [Citation.]  The ALJ's finding also concerns a question of law because the term 'unitary business' is statutory and, thus, requires interpretation").
(footnote: 11)
 The clearly erroneous standard of review is "between a manifest weight of the evidence standard and a 
de novo
 standard so as to provide some deference to the [agency's] experience and expertise."  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d 
at 302
.
  
Although we must afford deference to the Department's experience and expertise
, we will reverse the Department's ruling " ' "when although there is evidence to support it, [we are] *** left with the definite and firm conviction that a mistake has been committed." ' "  
JM Aviation
, 341 Ill. App. 3d at 9, 791 N.E.2d at 1158, 
quoting 
AFM Messenger Service
, 198 Ill. 2d at 393, 763 N.E.2d at 280-81, 
quoting 
United States v. United States Gypsum Co.
, 333 U.S. 364, 395, 92 L. Ed. 
746, 766, 68 S. Ct. 525, 542
 (1948).  

We now turn to the merits of the instant case.  The Department argues that the circuit court erred in reversing the finding that Dow and Marion Merrell Dow operated as a unitary business during the post-transition years 1991 through 1993.  Dow, on the other hand, argues that the circuit court erred in upholding the finding of a unitary business for the year 1990.  We agree with the circuit court that the finding of a unitary business for the year 1990 is not clearly erroneous, but the finding of a unitary business with respect to the years 1991 through 1993 is not sustainable because the minimum constitutional threshold is not met. 

"Under both the Due Process and the Commerce clauses of the [United States] Constitution, a State may not, when imposing an income-based tax, 'tax value earned outside its borders.' "  
Container Corp. of America v. Franchise Tax Board
, 463 U.S. 159, 164, 77 L. Ed. 2d 545, 552, 103 S. Ct. 2933, 2939
 
(1983), quoting 
ASARCO Inc. v. Idaho State Tax Comm'n
, 458 U.S. 307, 315, 73 L. Ed. 2d 787, 794, 102 S. Ct. 3103, 3108
 
(1982).
  A state may, however, tax a portion of a business's income that arises out of interstate activities if there is a nexus between the interstate activities and the state and a rational relationship between the income attributed to the state and the intrastate values of the enterprise.  
Container Corp. of America
, 463 U.S. at 165-66, 
77 L. Ed. 2d at 553, 103 S. Ct. at 2940
.
  
The requisite nexus is established if the business avails itself of the " 'substantial privilege of carrying on business' within the State."  
Mobil Oil Corp. v. Commissioner of Taxes of Vermont
, 445 U.S. 425, 437, 63 L. Ed. 2d 510, 520, 100 S. Ct. 1223, 1231
 
(1980), quoting 
Wisconsin v. J. C. Penney Co.
, 311
 U.S. 435, 444-45, 85 L. Ed. 267, 271, 61 S. Ct. 246, 250
 
(1940).  In such a case, a state need not attempt to isolate the intrastate income-producing activities from the rest of the business, but may tax an apportioned sum of the business's income " 'so long as the intrastate and extrastate activities formed part of a single unitary business.' "  (Emphasis omitted.)  
ASARCO
, 458 U.S. at 316, 73 L. Ed. 2d at 795, 102 S. Ct. at 3109,
 quoting 
Mobil Oil
, 445 U.S. at 438, 63 L. Ed. 2d at 521, 100 S. Ct. at 1232
.
  The unitary business apportionment method is a widely accepted approach to the problem of taxing businesses which operate in more than one jurisdiction.  
Container Corp. of America
, 463 U.S. at 165, 77 L. Ed. 2d at 553, 103 S. Ct. at 2940
.
  This method calculates the local tax base 

"by first defining the scope of the 'unitary business' of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that 'unitary business' between the taxing jurisdiction and the rest of the world on the basis of a formula [that] tak[es] into account objective measures of the corporation's activities within and [outside] the jurisdiction."  
Container Corp. of America
, 463 U.S. at 165, 77 L. Ed. 2d at 553, 103 S. Ct. at 2940
.
  

The instant case is not concerned with the mechanics of apportionment.  Rather, the central issue in this case is 
whether Dow, Marion Merrell Dow and their respective subsidiaries were engaged in a unitary business during the tax years at issue.  The Supreme Court holds that the requirements of the due process and commerce clauses are met when a unitary business is generally defined as " 'a highly integrated business which benefits from an umbrella of centralized management and controlled interaction.' "  
ASARCO
, 458 U.S. at 319, 73 L. Ed. 2d at 797, 102 S. Ct. at 3110,
 quoting 
Exxon Corp. v. Wisconsin Department of Revenue
, 447 U.S. 207, 224, 65 L. Ed. 2d 66, 81, 100 S. Ct. 2109, 2120
 
(1980).  In other words, "the proper inquiry looks to 'the underlying unity or diversity of [the] business enterprise' " and, specifically, to whether " 'contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale.' "  
F. W. Woolworth Co. v. Taxation & Revenue Department of New Mexico
, 458 U.S. 354, 363, 364, 73 L. Ed. 2d 819, 827-28, 102 S. Ct. 3128, 3135
 
(1982), quoting 
Mobil Oil
, 445 U.S. at 440, 438, 63 L. Ed. 2d at 523, 521
, 100 S. Ct. at 1233, 1232
.  Under 
Container Corp. of America
, the constitutional threshold of the requisite degree of centralization of management is stated in terms of the commonality of managerial or operational resources.
  See 
Container Corp. of America
, 463 U.S. at 166, 77 L. Ed. 2d at 554, 103 S. Ct. at 2941
 
(
reaffirming the Supreme Court's long-standing holding that "the unitary business principle could apply *** to a series of similar enterprises operating separately in various jurisdictions but 
linked by common managerial or operational resources 
that produced economies of scale and transfers of value" (emphasis added)).

In Illinois, a unitary business is defined by statute and through the regulations of the Department.  The applicable provision 
of the Illinois Income Tax Act (the Act), which 
has not changed between 1990 and today (compare Ill. Rev. Stat. 1989, ch. 120
, par. 15-1501(a)(27) and 35 ILCS 5/1501(a)(27) (West 2002)
), 
defines a "unitary business group," in pertinent part as:

"
a group of persons related through common ownership whose business activities are integrated with, dependent upon and contribute to each other.  ***  Common ownership in the case of corporations is the direct or indirect control or ownership of more than 50% of the outstanding voting stock of the persons carrying on unitary business activity. Unitary business activity can ordinarily be illustrated where the activities of the members are: (1) in the same general line (such as manufacturing, wholesaling, retailing of tangible personal property, insurance, transportation or finance); or (2) are steps in a vertically structured enterprise or process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining, and marketing); and, in either instance, the members are functionally integrated through the exercise of strong centralized management (where, for example, authority over such matters as purchasing, financing, tax compliance, product line, personnel, marketing and capital investment is not left to each member).
"

The Department's regulation section 100.9700(g)
 further provided, in pertinent part:

"Both elements of strong centralized management, i.e., strong central management authority and the exercise of that authority through centralized operations, must be present in order for persons to be a unitary business group under *** [s]ection 1501(a)(27)."  86 Ill. Admin. Code §100.9700(g) (Supp. 1993).

From the outset, we make clear that this case does not present any issues as to the constitutionality of our Illinois statute or the Department's regulations.  If anything, the prerequisites for finding a unitary business under Illinois law may well be stricter than those which would satisfy the federal constitutional threshold articulated in 
Container Corp. of America
.  To begin with, unlike the constitutional test, Illinois explicitly requires that the activities of the companies be in the same general line of business or 
steps in a vertically structured enterprise or process.
(footnote: 12)  Dow maintains that, for all of the years at issue, it and Marion Merrell Dow were not in the same general line of business because Dow manufactured primarily bulk chemicals, plastics and hydrocarbons and Marion Merrell Dow manufactured finished pharmaceutical products.  We disagree.  

As the Department points out, section 1501(a)(27)
 does not require that the companies' businesses be identical.  
The Department, therefore, contends that the "sameness" requirement is satisfied here because Dow and Marion Merrell Dow both engaged in the development, manufacture and sale 
of chemical products, even if they did not produce all the same products.  We agree with the Department's position that such similarity of business activities is sufficient.  See 
PPG Industries, Inc. v. Department of Revenue
, 328 Ill. App. 3d 16, 25, 765 N.E.2d 34, 42 (2002) (upholding the finding that a parent company's chemical division operations and its subsidiary's oil and gas operations were in the same general line of business within the meaning of section 1501(a)(27)
, as both were in the business of manufacturing and selling chemicals); 
Hormel Foods
, 316 Ill. App. 3d at 1206, 738 N.E.2d at 150
 (upholding the finding 
"that Hormel and its subsidiaries [were] in the same general line of business[] [because] all of the companies [were] involved in some aspect of manufacturing in the food industry"). 
 Consequently, we cannot say that the determination that the two companies were in the same general line of business is clearly erroneous.

Moreover, it was not a clear error to find that the two companies were also 
steps in a vertically structured enterprise or process.  The pertinent Department regulation gives an example of a corporation A, a manufacturer of furniture, and a corporation B, a furniture finisher that purchases corporation A's unfinished furniture, as being steps in a vertically structured enterprise or process, irrespective of whether corporation B buys corporation A's furniture at a fair market arm's-length price.  
86 Ill. Admin. Code §100.9700(h) (Supp. 1993)
. 
 Here, as the Department points out, a nontrivial part of Dow's business was the manufacture of pharmaceutical ingredients, and Dow was a major supplier of active and inactive pharmaceutical ingredients to Marion Merrell Dow.  The stipulations show that a part of Dow's Midland manufacturing complex was dedicated to the manufacture of pharmaceutical ingredients.  As noted, Tysse testified that the pharmaceutical industry, typically through third-party distributors, purchased pharmaceutical ingredients from Dow.  Falla testified that Dow's direct sales to Marion Merrell Dow were significant, and Price testified that Dow sold pharmaceutical ingredients to Marion Merrell Dow directly, providing between 15% and 20% of Marion Merrell Dow's active pharmaceutical ingredients (or approximately 4% of all ingredients, active and inactive).  Marion Merrell Dow then used the Dow-supplied ingredients 
in the manufacture of its finished pharmaceutical products.  It was further stipulated that 
Dow was Marion Merrell Dow's sole supplier of the active ingredient for its drug Lorelco, and the loss of Dow as a source of supply to Marion Merrell Dow would have had a "material adverse effect" on its business.
  On these facts, we sustain the finding that Dow and Marion Merrell Dow were 
steps in a vertically structured enterprise or process
.

However, over and above the similarity or vertical structuring of the businesses, section 1501(a)(27)
 
requires that the companies be "
functionally integrated through the exercise of strong centralized management.
"  35 ILCS 5/1501(a)(27) (West 2002).  This requirement 
may well be stricter than the constitutional requirement of 
" 'a highly integrated business which benefits from an umbrella of centralized management and controlled interaction' " (
ASARCO
, 458 U.S. at 319, 73 L. Ed. 2d at 797, 102 S. Ct. at 3110, 
quoting 
Exxon Corp.
, 447 U.S. at 224, 65 L. Ed. 2d at 81
, 100 S. Ct. at 2120
), given that the constitutional 
threshold for satisfying the centralization of management laid out in 
Container Corp. of America
 speaks in terms of commonality of managerial or operational resources.  Nevertheless, for the purposes of reviewing the propriety of the tax assessments for the years 1991 through 1993, we need not resolve whether the Illinois requirement of functional integration through the exercise of strong centralized management is stricter than its constitutional counterpart.  Even if our Illinois statute is coextensive with the federal constitutional standard, the facts with respect to the post-transition years 1991 through 1993—as the circuit court recognized—fall short of meeting the minimum constitutional threshold.  However, as shall be discussed later on, this conclusion need not necessarily be drawn with respect to the transitional year 1990.

We now proceed to review the ALJ's findings with respect to functional integration and strong centralized management.  
T
he ALJ 
found the flow of value between Dow and Marion Merrell Dow to have occurred in the form of significant (15% to 20%) intercompany sales of active pharmaceutical ingredients, including one ingredient that was only available from Dow; the construction and sale to Marion Merrell Dow of 
several manufacturing and research-related facilities
 within Dow's Midland complex; Dow's subsequent operation of said facilities on behalf of Marion Merrell Dow; Dow's purchase of the toxicology lab from Marion Merrell Dow, coupled with Dow's agreement to provide Marion Merrell Dow with toxicology services; intercompany loans and a guaranty of Marion Merrell Dow's obligations in connection with its European venture, noting also the existence of unused revolving credit lines, which expired in July of 1990 and were provided at no cost; and Dow's provision of various administrative services to Marion Merrell Dow, noting however that Marion Merrell Dow had its own departments for many of these services.
(footnote: 13)  With respect to the administrative services, the ALJ found that Dow was not reimbursed at arm's-length rates—"[a] flow of value was evident because continuous services were charged to [Merrell Dow Pharmaceuticals] based on 'measurable units of effort.' ***  Incidental services were charged *** 'at actual cost.' "  As noted, the ALJ rejected, as based on incomplete evidence, the expert testimony of Dr. Carlson that all transactions were conducted at arm's length.  In support of the existence of strong centralized management,
 the ALJ noted the overlapping directors and further listed "evidence of oversight" by Dow of Marion Merrell Dow's activities.  This "oversight" included receiving reports concerning the status of various Marion Merrell Dow's pharmaceutical products, as well as reports on finances, global strategy, business proposals, marketing, research, changes in senior management, workforce reduction, environment, health and safety,
 and pending legal proceedings
. 

As the circuit court pointed out, the major problem with the ALJ's approach was not differentiating the facts with respect to the individual tax years involved.
  
The Department, which also does not direct its arguments toward any particular year at issue, essentially reiterates the ALJ's discussion in that it asserts that the two companies had substantially overlapping directorates; almost half of Marion Merrell Dow's officers were former Dow employees; and Dow provided various administrative and technical services to Marion Merrell Dow.  The Department further emphasizes 
that Dow continued to produce a significant volume of the active pharmaceutical ingredients needed by Marion Merrell Dow to make finished pharmaceutical products; constructed, sold to Marion Merrell Dow, and agreed to operate under contract an extensive facility for producing pharmaceutical compounds; provided research and agreed to provide toxicology services to Marion Merrell Dow; provided $70 million in financing to Marion Merrell Dow so that 
its wholly owned subsidiary could repurchase its shares; and issued a $200 million guaranty of Marion Merrell Dow's obligations in connection with its European venture; and Marion Merrell Dow, for its part, regularly loaned Dow hundreds of millions of dollars on a short-term basis so that Dow could "dress up" its public financial statements. 

Dow, on the other hand, stresses that it and Marion Merrell Dow had separate boards, separate management teams, separate administrative functions, separate operational functions, and there was no supervision of Marion Merrell Dow employees by Dow employees.  Dow also contends that there was no domination of Marion Merrell Dow's board by Dow-affiliated directors, and all transactions between Dow and Marion Merrell Dow were carried out at arm's length.  

We agree with the Department that both companies dealt extensively with each other to their mutual benefit.   
However, a mutually beneficial business relationship is not sufficient for a unitary business finding.  The Department skirts the issue of whether any of these mutually beneficial transactions occurred as 
a result of
 integration and centralization of management (or common managerial or operational resources
) that produced economies of scale
.
  
We agree with Dow that, with respect to the post-transition years 1991 through 1993, they did not.  As discussed, our immediate focus is on the constitutional threshold of a unitary business requirement.  
F. W. Woolworth
, 
ASARCO
 and 
Container Corp. of America
 are instructive.

In 
F. W. Woolworth
, the Supreme Court reversed a finding of a unitary business
.  F. W. Woolworth Co. (Woolworth) and its four foreign subsidiaries all engaged in the retail business.  
F. W. Woolworth
, 458 U.S. at 356, 73 L. Ed. 2d at 823, 102 S. Ct. at 3131
.  Woolworth wholly owned three of the subsidiaries and had a 52% majority interest in the fourth.  
F. W. Woolworth
, 458 U.S. at 356-57, 73 L. Ed. 2d at 823, 102 S. Ct. at 3131
.  
As is the case here, there were some directors in common between the parent and the subsidiaries.  
F. W. Woolworth
, 458 U.S. at 368, 73 L. Ed. 2d at 830, 102 S. Ct. at 3137
.  
With one possible exception, none of the subsidiaries' officers were a current or former employee of the parent.  
F. W. Woolworth
, 458 U.S. at 366, 73 L. Ed. 2d at 829
, 102 S. Ct. at 3136
.  
There was some in-person and frequent mail and telephone communication between the upper management at the parent and the subsidiaries.  
F. W. Woolworth
, 458 U.S. at 368, 73 L. Ed. 2d at 830
, 102 S. Ct. at 3137
.  
Major financial decisions of the subsidiaries had to be approved by the parent.  
F. W. Woolworth
, 458 U.S. at 368-69, 73 L. Ed. 2d at 830, 102 S. Ct. at 3137
.  
Woolworth's published financial statements, like Dow's, included subsidiary information.  
F. W. Woolworth
, 458 U.S. at 369, 73 L. Ed. 2d at 830-31, 102 S. Ct. at 3137-38
.  
However, Woolworth had no central personnel training for its subsidiaries, nor was there exchange of personnel between any of the entities.  
F. W. Woolworth
, 458 U.S. at 365-66, 366-67, 73 L. Ed. 2d at 828-29, 102 S. Ct. at 3136, 3137
.  
There was no centralized purchasing, manufacturing or warehousing of merchandise.  
F. W. Woolworth
, 458 U.S. at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135-36
.  
Also, like Marion Merrell Dow, each subsidiary had a complete accounting department and financial staff and its own outside counsel.  
F. W. Woolworth
, 458 U.S. at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135-36
. 
 Each subsidiary was responsible for obtaining its own financing from sources other than the parent.  
F. W. Woolworth
, 458 U.S. at 366, 73 L. Ed. 2d at 829, 102 S. Ct. at 3136
.  
With respect to who made the decisions for " 'seeing to the merchandise, [store] site selection, advertising and accounting control,' " the undisputed testimony stated that " '[e]ach subsidiary perform[ed] these functions autonomously and independently of the parent company.' "  
F. W. Woolworth
, 458 U.S. at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135
.  The Supreme Court found that "[e]xcept for the type of occasional oversight—with respect to capital structure, major debt, and dividends—that any parent gives to an investment in a subsidiary, there is little or no integration of the business activities or centralization of the management of [the] *** corporations."
  
F. W. Woolworth
, 458 U.S. at 369, 73 L. Ed. 2d at 831, 102 S. Ct. at 3138
.

The same result—reversing the unitary business finding—was reached in 
ASARCO
.  ASARCO, a mining and smelting company,
 collected dividends, interest income and realized capital gains in connection with foreign corporations in which it owned interest.  
ASARCO
, 458 U.S. at 309-10, 73 L. Ed. 2d at 790-91, 102 S. Ct. at 3105-06
.  ASARCO owned a majority interest of slightly in excess if 51% in two of the corporations, Southern Peru and M.I.M.  
ASARCO
, 458 U.S. at 320, 323, 73 L. Ed. 2d at 798, 799
, 102 S. Ct. at 3111, 3112
.  The Supreme Court noted that ASARCO's majority interests, if asserted, could enable it to control the management of the two corporations.  
ASARCO
, 458 U.S. at 321, 323, 73 L. Ed. 2d at 798, 799
, 102 S. Ct. at 3112
.  However, with respect to M.I.M., ASARCO did not exercise its right to elect directors and had taken no part in the selection of the officers.
  
ASARCO
, 458 U.S. at 323, 73 L. Ed. 2d at 799, 102 S. Ct. at 3112
.  
M.I.M and ASARCO did not have any common directors or officers and operated entirely independently.  
ASARCO
, 458 U.S. at 323, 73 L. Ed. 2d at 799, 102 S. Ct. at 3112
.  On the other hand, ASARCO apparently did appoint 6 of the 13 directors of Southern Peru.  
ASARCO
, 458 U.S. at 322, 73 L. Ed. 2d at 798
, 102 S. Ct. at 3112
.  
However, similar to the instant case, ASARCO could not control Southern Peru because eight 
votes were required to pass a resolution, and Southern Peru's articles and bylaws could be changed only by the unanimous consent of the four stockholders.  
ASARCO
, 458 U.S. at 322, 73 L. Ed. 2d at 798, 102 S. Ct. at 3112
.  The testimony showed that ASARCO did not control the operations of Southern Peru, and
 Southern Peru did not seek direction or approval from ASARCO on major decisions.
  
ASARCO
, 458 U.S. at 322, 73 L. Ed. 2d at 799, 102 S. Ct. at 3112
.  
The Supreme Court characterized ASARCO's interest in M.I.M. as "merely an investment" and ASARCO and Southern Peru as "insufficiently connected" to permit them to be classified as a unitary business.  
ASARCO
, 458 U.S. at 322-23, 73 L. Ed. 2d at 799, 102 S. Ct. at 3112-13
.

In contrast, 
in 
Container Corp. of America
, where the finding of a unitary business was upheld
, there was parental involvement in the operations of the subsidiaries which was "grounded in [the parent's] operational expertise and its overall operational strategy
."  
Container Corp. of America
, 463 U.S. at 180 n. 19, 77 L. Ed. 2d at 562 n. 19, 103 S. Ct. at 2948 n. 19
.  A number of facts in 
Container Corp. of America
 were similar to those in 
F. W. Woolworth
 and 
ASARCO
 in that the subsidiaries 
in 
Container Corp. of America
 were "relatively autonomous" with respect to matters of personnel and day-to-day management; transfers of personnel from the parent to the subsidiaries were rare and occurred only when a subsidiary could not fill a position locally, and the parent provided no formal training program for the subsidiaries' employees; and a
lthough the parent had a number of its directors and officers on the boards of directors of the subsidiaries, parent-related directors did not generally play an active role in management decisions.  
Container Corp. of America
, 463 U.S. at 172, 77 L. Ed. 2d at 557-58, 103 S. Ct. at 2943-44
.  
However, the overriding factors that tipped the scales in favor of a unitary business finding were that one senior vice-president of the parent and four of the parent's officers were charged with the task of overseeing the operations of the subsidiaries and 
established general standards of professionalism and ethical practices
, as well as profitability, and dealt with major problems and long-term decisions; t
he decisions of the subsidiaries regarding capital expenditures were subject to review by the parent, with problems generally being worked out by consensus rather than domination by the parent; 
the parent
 either held directly or guaranteed 
approximately half of the subsidiaries' long-term debt; the parent provided advice and consultation to the subsidiaries 
regarding manufacturing techniques, engineering, design, architecture, insurance, and cost accounting either by entering into technical service agreements with them or by formal arrangement; and the parent assisted the subsidiaries in procurement of equipment either by selling them used equipment of its own or by employing its purchasing department to act as an agent for the subsidiaries.  
Container Corp. of America
, 463 U.S. at 172-73, 77 L. Ed. 2d at 558, 103 S. Ct. at 2944
.  
While the Supreme Court declined to decide "whether any one of these factors would be sufficient as a constitutional matter to prove the existence of a unitary business," the court stated that "[t]aken in combination, at least, they clearly demonstrate that the state court reached a conclusion 'within the realm of permissible judgment.' "  
Container Corp. of America
, 463 U.S. at 179-80, 77 L. Ed. 2d at 562, 103 S. Ct. at 2948
.  The court did find two factors particularly noteworthy—the flow of capital resources from the parent to the subsidiaries through non-arm's-length loans and loan guarantees, and the managerial role the parent played in the subsidiaries' affairs by establishing business guidelines, being involved in the subsidiaries' business decisions through the "consensus" process, and providing "sometimes uncompensated technical assistance." 
 
Container Corp. of America
, 463 U.S. at 180 n. 19, 77 L. Ed. 2d at 562 n. 19, 103 S. Ct. at 2948 n. 19
.

Here, at least with respect to the post-transition years 1991 through 1993
, as in 
F. W. Woolworth
, Dow's "oversight" of Marion Merrell Dow in the form of receiving miscellaneous reports concerning the status of its various products and activities 
is of the type that a parent would give to an investment in a subsidiary and is not indicative of the integration of business activities or centralization of management of the companies, especially given Dow's "hands off" attitude towards Marion Merrell Dow
.
  
Dow, like the parent companies in 
F. W. Woolworth
 and 
ASARCO
, 
 had no direct control over the operations of Marion Merrell Dow because Dow could only name 3 of the 12 directors of Marion Merrell Dow.  
After Marion Merrell Dow's authorization policies went into effect in mid-1990, Dow was divested of any indirect management authority it may have had over the operations of Merrell Dow Pharmaceuticals
 due to employee "loaning" and post-merger confusion as to the proper managerial channels. 
 As Falla, Lyons, Bailey, Beckwith and Lynch testified (and the ALJ agreed), there were no overlapping officers between the companies; no reportability between Dow's and Marion Merrell Dow's officers; Marion Merrell Dow had separate departments for its administrative functions;
(footnote: 14) and 
it was not required to seek authorization from Dow in conducting its affairs.  Unlike the parent companies in 
Container Corp. of America
, Dow did not establish any standards for Marion Merrell Dow to follow and did not influence Marion Merrell Dow's operations in ways grounded in Dow's own operational expertise and its overall operational strategy
.  Several individuals testified that Marion Merrell Dow was not interested in the expertise of a bulk manufacturer of chemicals.  The companies did not operate any facilities jointly, nor did they share any departments or bank accounts.  
 

Although, as noted, the ALJ found that the administrative services to Merrell Dow Pharmaceuticals were not provided at arm's length because the compensation was based on "measurable units of effort" and incidental services at "actual cost," 
the ALJ cited no legal authority in support of that conclusion.  
Even if the ALJ was correct, any flow of value due to this supposed non-market-rate pricing of the administrative services would have, in any event, been 
de minimus
 because, according to Lynch's uncontroverted testimony, 
less than 1% of Marion Merrell Dow's administrative service contracts were for services from Dow
.
  We also disagree with the ALJ's conclusion that Marion Merrell Dow's continued purchasing of pharmaceutical ingredients from Dow at "the lowest available U.S. price" or a "mutually agreed" price, Marion Merrell Dow's dependence on Dow's pharmaceutical ingredients and the benefit to it from having a continuity of supply of the ingredients, and the benefits to both companies that resulted from the intercompany sales of assets and financial transactions (including Dow's construction and sale of the manufacturing and research facilities to Marion Merrell Dow and the companies' agreement that Dow would continue to operate the facilities
, as well as Marion Merrell Dow's sale of its toxicology lab to Dow)
(footnote: 15)—were indicative of a unitary business operation because of the non-arm's-length nature of the transactions.  
The Department introduced no expert testimony that would support its position that these transactions between the two companies were not carried out at arm's length.  The record, on the other hand, speaks to the contrary.  Marion Merrell Dow received market-rate or better interest for the short-term loans to Dow.  Dow charged Marion Merrell Dow $1 million for the guaranty in connection with the European venture.  All transactions were reviewed by appropriate auditing authorities at the two companies.

In sum, the facts of the instant case are indicative of a business alliance between a chemical giant and a pharmaceutical giant, rather than of a unitary enterprise.
 
 On such facts, the finding of a unitary business is not constitutionally permissible and, therefore, is clearly erroneous.  The flow of value between the two companies during 1991 through 1993 did not occur as a result of
 integration and centralization of management (or common managerial or operational resources
)
.

The same cannot be said about the transitional year 1990.  
Dow relies on 
the decision of our supreme court in 
Citizens Utilities Co. of Illinois v. Department of Revenue
, 111 Ill. 2d 32, 488 N.E.2d 984 (1986),
 and the Fourth District's decision in 
A.B. Dick Co. v. McGraw
, 287 Ill. App. 3d 230, 678 N.E.2d 1100 (1997)
, and
 argues that 
the "strong centralized management" prong of the Illinois unitary business test is to be construed 
more narrowly than its constitutional counterpart because Illinois requires active parental involvement in the affairs of the subsidiary.  In further support, Dow cites to 
the Department's own regulation which, as noted, states, in pertinent part:

"Both elements of strong centralized management, i.e., strong central management authority and the exercise of that authority through centralized operations, must be present in order for persons to be a unitary business group under *** [s]ection 1501(a)(27)."  86 Ill. Admin. Code §100.9700(g) (Supp. 1993)
.
(footnote: 16) 

Dow 
maintains that such involvement on its part in 
the operations of Marion Merrell Dow was lacking during 1990. 

A.B. Dick
 stated that under Illinois law, strong centralized management and, thus, functional integration are found where " 'the parent corporation enjoyed actual, centralized control' over the group [of subsidiaries]."  
A.B. Dick
, 287 Ill. App. 3d at 238
, 678 N.E.2d at 1106, 
quoting 
Citizens Utilities
, 111 Ill. 2d at 51, 488 N.E.2d at 992
. 
 We note, however, that 
A.B. Dick
 appears to have rejected a strict interpretation of the "
actual, centralized control" requirement.  The court first noted that t
he current regulation's language requiring 
"strong central management authority and the exercise of that authority through centralized operations
"
 was also contained in the early Department's regulation in effect before section 1501(a)(27)
 was enacted in 1982.
(footnote: 17)  When section 1501(a)(27)
 was enacted
, it borrowed the language of the early regulation, with the exception of the foregoing requirement.  
A.B. Dick
 saw the failure to incorporate the early regulation's requirement of 
"strong central management authority and the exercise of that authority through centralized operations"
 into section 1501(a)(27) 
as casting doubt upon the continuing validity of that language
.  
A.B. Dick
, 287 Ill. App. 3d at 238, 678 N.E.2d at 1106
.
  As the Department points out, 
A.B. Dick
 also looked to the language of section 1501(a)(27)
 itself and stated:

"That language does not suggest that any great deal of activity on the part of the parent is necessary to show an exercise of authority, let alone the exercise of that authority through centralized operations. ***  [T]he day-to-day management of the subsidiary need not be controlled by the parent."  
A.B. Dick
, 287 Ill. App. 3d at 238, 678 N.E.2d at 1106
, citing 
Citizens Utilities
, 111 Ill. 2d at 48, 488 N.E.2d at 990
.

A.B. Dick
's position is not without merit.  
A.B. Dick
's
 construction of a unitary business standard appears to parallel that of the Supreme Court.
  
The 
A.B. Dick
 court ultimately 
analyzed the matter by reference to 
Container Corp. of America
 and 
F. W. Woolworth
.  See 
A.B. Dick
, 287 Ill. App. 3d at 239-41, 678 N.E.2d at 1106
-07
.
  In this regard, we again note that section 1501(a)(27)
's requirement of 
"
functional[] integrat[ion] through the exercise of strong centralized management" mirrors the constitutional definition of a unitary business 
as 
" 'a highly integrated business which benefits from an umbrella of centralized management and controlled interaction' " 
(
ASARCO
, 458 U.S. at 319, 73 L. Ed. 2d at 797, 102 S. Ct. at 3110, 
quoting 
Exxon Corp.
, 447 U.S. at 224, 65 L. Ed. 2d at 81, 100 S. Ct. at 2120
)
.  
It would appear that 
A.B. Dick
 takes the view that Illinois law does not go beyond what 
Container Corp. of America
 requires
. 

This position may be somewhat difficult to reconcile with our supreme court's decision in 
Citizens Utilities
, where the court, while leaving the term "actual, centralized control
" undefined,
 
indicated that the Department was not free to ignore its own regulation requiring both central management authority and the use of that authority in centralized operations
 for a finding of strong centralized management.  See 
Citizens Utilities
, 111 Ill. 2d at 50-51, 488 N.E.2d at 992
.
  We need not, however, determine whether section 1501(a)(27)
 and the Department's regulation section 100.9700
(g) impose a stricter threshold than that articulated in 
Container Corp. of America
—namely, the commonality of managerial or operational resources—
as 
the ALJ's determination of a unitary business with respect to the year 1990 is sustainable even under a stricter standard than the constitution requires.

After reviewing the record, the circuit court found that it supported the determination of a unitary business for the year 1990 because, in essence, Marion Merrell Dow had not yet transitioned to functioning as a fully independent entity, as evidenced by Marion Merrell Dow's reliance on Dow personnel to staff its operations, as well as the lack of an independent authorization policy at Marion Merrell Dow until mid-1990.  We agree that these facts make a substantial difference in the unitary business determination for the year 1990, as compared to the post-transition years of 1991 through 1993.
 The circuit court stated:

"As [Marion Merrell Dow] was attempting to establish itself as an entity separate from, yet (majority) owned by Dow in 1990, it relied upon Dow personnel to staff its operations.  The [employee loaning agreement] provided for payment by [Marion Merrell Dow] to Dow for the use of those employees, and the expenditures apparently exceeded $364 million in 1990 for those services ***.  Although Dow argues that a fair price was paid for those services, this appears to be a type of 'sharing or exchange of value not capable of precise identification or measurement' raised by 
Citizens Utilities
 [citation].  Where in the marketplace could [Marion Merrell Dow] find personnel with such diverse expertise to plug into its operations with the ease provided by the [loaning] of Dow's employees?  How could this possibly have been achieved at the price offered by Dow? ***

Another matter which lends support to the ALJ's conclusion for 1990 concerns the lack of an independent [a]uthorization [p]olicy [at Marion Merrell Dow] until mid-1990.  While the new [Marion Merrell Dow] was disengaging the former [Merrell Dow Pharmaceuticals] interests from Dow at the end of 1989 and into 1990, with large numbers of 'loaned' employees from Dow acting with no explicit authorization directives other than those set forth by their 'former' employer, Dow, it was not unreasonable to the ALJ to conclude that sufficient integration remained into 1990 for a finding of a unitary business."
(footnote: 18)
 We further add that it would not be clearly erroneous to infer that in the inherent chaos of the transition, the new executive officers at Marion Merrell Dow who only recently were executive officers at Merrell Dow Pharmaceuticals
(footnote: 19)—then a wholly owned subsidiary of Dow—sought guidance, direction and control from Dow and acted in accordance therewith.  This inference has even more force in light of the fact that until mid-1990 there was no authorization policy at Marion Merrell Dow to prevent that from happening.  
Accordingly, it was not clearly erroneous to conclude that the requirement of "strong central management authority and the exercise of that authority through centralized operations
" was met here.  See 
A.B. Dick
, 287 Ill. App. 3d at 240-41
 (finding the evidence of strong centralized management in, among other things, the fact that all employees of the subsidiary at the time of its incorporation were "former" employees of the parent); 
Hormel Foods
, 316 Ill. App. 3d at 1207 (the ALJ properly relied on, among other things, the "significant movement of highly placed personnel from Hormel to the subsidiaries and often back to Hormel").

For the reasons set forth above, we affirm the judgment of the circuit court, sustaining the deficiency for the tax year 1990 and reversing the deficiencies for the years 1991 through 1993.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.

FOOTNOTES
1:
As defined in section 1501(a)(27)
 of the Illinois Income Tax Act (35 ILCS 5/1501(a)(27) (West 2002)).

2:
As is explained below, Dow was limited to having no more than three of its employees on the Marion Merrell Dow's board of directors.  The other two persons holding a dual directorship were not employees of Dow.

3:
For instance, in December of 1989, Marion Merrell Dow loaned Dow $70 million; in December of 1990, $275 million; in December of 1991, $415 million; in December of 1992, $230 million; and in December of 1993, $175 million.

4:
As is explained below, 
a corporate authorization policy describes every possible business transaction and designates which employees can authorize certain transactions
.

5:
After one of the directors-employees left Dow, it took some time to replace him with another Dow employee.

6:
Leo Kessel, a certified public accountant for Deloitte & Touche who provided auditing services to Dow, also testified that Marion Merrell Dow's financial information was consolidated within Dow's financial information in conformity with the generally accepted accounting principles requiring such consolidation where one company owns more than 50% of another company.

7:
The term "consolidated sales" was left undefined.  However, this testimony indicates that Dow's sales to Marion Merrell Dow were substantial and not 
de minimus
.

8:
Caustic soda is sodium hydroxide.

9:
Beckwith explained that she had a "lifeline back to Dow" 
by the virtue of being included in a transfer agreement pursuant to which five high-level employees of Merrell Dow Pharmaceuticals who originally started at Dow were able to return to Dow upon the completion of their post-merger tasks at Merrell Dow Pharmaceuticals. 

10:
Process research refers to the means of mass-producing what had previously been produced in a laboratory.

11:
As the Supreme Court explained:

"It will do the cause of legal certainty little good if this Court turns every colorable claim [of error] in a particular application of [the unitary business] principles into a 
de novo
 adjudication, whose unintended nuances would then spawn further litigation and an avalanche of critical comment."  
Container Corp. of America v. Franchise Tax Board
, 463 U.S. 159, 176, 77 L. Ed. 2d 545, 560, 103 S. Ct. 2933, 2946
 
(1983).

12:
We note, however, that the common ownership requirement under our Illinois statute is implicit in the constitutional test because without some commonality of ownership it would be all but impossible to achieve 
the commonality of managerial or operational resources.
  In any event, it is undisputed that the common ownership requirement of the Illinois unitary business test is met here, as during all of the years in question Dow directly or indirectly owned in excess of 67% of Marion Merrell Dow's stock.  

13:
More specifically, the ALJ found the flow of value to Marion Merrell Dow to have occurred not only in the ready availability and continuity of supply of certain pharmaceutical ingredients, but also in the price Marion Merrell Dow paid, which was based "on the lowest available U.S. market price or a mutually agreed price."  The ALJ further found that the flow of value was evidenced by the fact that Marion Merrell Dow did not seek other suppliers for the ingredients it could purchase from Dow, and noted that Dow sought to become the preferred supplier of bulk pharmaceuticals to Marion Merrell Dow.  The ALJ also referred to "flows of knowledge" from Dow's "certain expertise from its prior experience of supplying the ingredients to [Merrell Dow Pharmaceuticals]."

14:
The administrative service arrangement between the two companies was analogous to the one in 
ASARCO
.  See 
ASARCO
, 458 U.S. at 321 n. 17, 73 L. Ed. 2d at 798 n. 17, 102 S. Ct. at 3111 n. 17
 (ASARCO provided its subsidiary Southern Peru with a purchasing service outside of Peru for a "fixed fee plus a commission," and a traffic service for its exports and imports outside of Peru and a preparation service for its United States tax return for " 'negotiated fair fee[s]
.' "  Southern Peru had its own purchasing, traffic and tax departments). 

15:
As noted, Dow was to operate the manufacturing and research facilities, as well as provide Marion Merrell Dow with toxicology services, beginning in December of 1993, at the earliest.

16:
See also section 100.3010(c)(1)(C)
 which provides, in pertinent part:

"[b]oth elements of strong centralized management, i.e., strong central management authority and the exercise of that authority through centralized operations, must exist in order to justify a conclusion that the operations of otherwise
 
seemingly separate trades or businesses are significantly integrated so as to constitute a unitary business."  86 Ill. Admin. Code §100.3010(c)(1)(C) (Supp. 1993)
.

17:
Section 300-2(c)(1)(C).

18:
Dow concedes that the former Merrell Dow Pharmaceuticals employees were technically employees of Dow for 13 months.  According to Dow, the purpose was to give Marion Merrell Dow time to determine whether the former Merrell Dow Pharmaceuticals employees would be retained and, if so, to provide for appropriate benefit plans.

Dow, however, argues that the circuit court incorrectly assumed that because Marion Merrell Dow did not have a written authorization policy until mid-1990, it must have been governed by Dow's authorization policy.  This contention mischaracterizes the circuit court's ruling which, in essence, states that because Marion Merrell Dow was operating with a large number of Dow's "loaned" employees, the ALJ was not clearly erroneous in inferring that the "loaned" employees, without an explicit directive stating otherwise, looked to Dow for guidance, direction and control.

19:
According to the joint stipulations of fact, during the transitional year, some 12 executive officers of Marion Merrell Dow were "transplants" from Merrell Dow Pharmaceuticals, including Marion Merrell Dow's new CEO.